**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————

|  |  |
|---|---|
| | ) |
| **RALPH NADER,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **Civil Action No. 10-989 (RCL)** |
| | ) |
| **FEDERAL ELECTION COMMISSION,** | ) |
| | ) |
| **Defendant.** | ) |

———————————————————————  )

## MEMORANDUM OPINION

Before the Court are plaintiff's Motion [16] for Summary Judgment and defendant's cross-Motion [18] for Summary Judgment.  Having carefully considered the Motions, Oppositions, Replies, the entire record in this case, and the applicable law, the Court will grant defendant's Motion for Summary Judgment and deny plaintiff's Motion for Summary Judgment. A review of the background of the case, the governing law, the parties' arguments, and the Court's reasoning in resolving those arguments follows.

## I.      BACKGROUND

In May 2008, former Independent Party Presidential candidate Ralph Nader filed an administrative complaint with the Federal Election Commission ("FEC").  AR at 1.  He alleged a conspiracy by many individuals, law firms, and political organizations affiliated with the Democratic Party to deny him and his running mate, Peter Camejo, ballot access in 18 states as candidates for President and Vice President of the United States in the 2004 general election.  *Id.* at 2.  This effort allegedly resulted in violations of the Federal Election Campaign Act of 1971, as amended ("FECA" or "Act").  *Id.* at 3.

Nader's complaint contained three counts.  Count 1 alleged that the Democratic National Committee ("DNC"), "18 state or local Democratic Parties, the Kerry–Edwards Campaign, the

Ballot Project," and "at least 95 lawyers from 53 law firms" made unreported contributions to the Kerry–Edwards Campaign, in violation of 2 U.S.C. §§ 434, 441a, and 441b. *Id.* at 90–93. Nader's theory was that the value of the legal services provided by law firms and individual lawyers who assisted in ballot challenges to Nader–Camejo constituted "contributions" to either the DNC or the Kerry–Edwards Campaign, and therefore resulted in violations of FECA's reporting requirements and contribution limits, as well as its ban on corporate contributions. *Id.* at 91. Count 2 accused the Service Employees International Union ("SEIU") and a Section 527 group called America Coming Together ("ACT") of making unreported contributions in connection with an effort to deny Nader–Camejo ballot access in Oregon, in violation of 2 U.S.C. §§ 441b(a) and 441a(a)(2)(B). *Id.* at 93–94. Count 3 alleged that several Section 527 organizations violated, *inter alia*, 2 U.S.C. §§ 434 and 441a by failing to register with the FEC and report contributions. *Id.* at 95–98.

The FEC assigned Nader's complaint a Matter Under Review ("MUR") number of 6021, and notified him that the "respondent(s)" in the complaint would receive notice within five business days, *id.* at 576, as is required by FECA. 2 U.S.C. § 437g(a)(1). Although Nader's complaint alleged that hundreds of individuals and entities violated FECA, the agency initially notified only David Thorne (treasurer of Kerry–Edwards 2004, Inc.), AR at 577, and Andrew Tobias (treasurer of the DNC). *Id.* at 579. The FEC decided to limit the number of persons and entities it would notify because it believed (erroneously) that Nader's complaint was "duplicative of previous MURs dismissing similar allegations," and because limiting the number of notices would "reserve resources" and comport with its "practice of avoiding over-notification." *Id.* at 1730.06. Also, at some point in the FEC's consideration of Nader's complaint, it assigned to it an "Enforcement Priority System" rating of "70/TIER: 1," indicating that the Nader matter had

been deemed, at least initially, to be of a high enforcement priority. *See id.* at 1730.02; Pl.'s Notice [22] 2.

In September 2008 (and again in January 2009), Mr. Nader supplemented his complaint, naming dozens of additional alleged violators of FECA and adding what amounted to a fourth count, which asserted that Pennsylvania state employees had worked on petition challenges at taxpayer expense to prevent Green Party nominee Carl Romanelli from appearing on the ballot as an Independent candidate for United States Senate in 2006. AR at 609. Also in September 2008, the FEC decided to notify the various Section 527 groups that Nader, in Count 3, claimed had failed to register as political committees. *Id.* at 729 (American Coming Together ("ACT")), 731 (Uniting People for Victory), 733 (United Progressives for Victory), 735 (National Progress Fund), 737 (Americans for Jobs), 739 (The Ballot Project, Inc.).

In November 2009, the FEC's General Counsel, Thomasenia P. Duncan, submitted a 32-page report to the Commission that recommended, *inter alia*, that the Commission find no reason to believe that the DNC, the Kerry Committee, their treasurers, or John Kerry personally violated FECA. *Id.* at 1730.32. The Commission later voted 6-0 in favor of the General Counsel's recommendations, and closed MUR 6021. *Id.* at 1810–11. Specifically, the Commission made the following findings:

1. Find no reason to believe that the Democratic National Committee, and Andrew Tobias, in his official capacity as treasurer, violated 2 U.S.C. §§ 441a(f), 441b and 434(b).

2. Find no reason to believe that Kerry for President 2004, Inc. and David Thorne, in his official capacity as treasurer, violated 2 U.S.C. §§ 441b, 441a(f) and 434(b).

3. Find no reason to believe that Kerry–Edwards 2004, Inc. and David Thorne, in his official capacity as treasurer, violated 2 U.S.C. §§ 441b, 441a(f) and 434(b).

4. Find no reason to believe that John Kerry violated the Federal Election Campaign Act of 1971, as amended, or the Commission's regulations.

5. Find no reason to believe that America Coming Together violated 2 U.S.C. §§ 434(b) and 441a(a)(1)(A) with respect to the allegation that it made an undisclosed excessive in-kind contribution.

6. Find no reason to believe America Coming Together violated 2 U.S.C. § 433.

7. Dismiss the complaint as to The Ballot Project.

8. Dismiss the complaint as to National Progress Fund, Uniting People for Victory, and Americans for Jobs.

9. Dismiss the complaint as to America Coming Together with respect to the allegation that it violated 2 U.S.C. § 434 by failing to report ballot expenditures.

10. Approve the Factual and Legal Analyses, as recommended in the First General Counsel's Report dated November 30, 2009 . . . .

11. Approve the appropriate letters.

12. Close the MUR 6021 file as to all Respondents and other persons and entities named in the complaint, as supplemented.

*Id.* at 1810–11.

After MUR 6021 was closed, Nader filed this complaint in this Court for wrongful dismissal pursuant to 2 U.S.C. § 437g(8)(A). Compl. [1] 30. Nader claimed that the FEC's decision was contrary to law, arbitrary and capricious, and an abuse of discretion because the agency failed to notify all of the respondents named in the administrative complaint and because its decision to dismiss the complaint as to certain respondents and close the MUR was unsupported. *Id.* at 1–2.

## II.   STANDARD OF REVIEW

Congress passed the Federal Election Campaign Act of 1971 as a "comprehensive approach to the problem of political campaign reform and excessively high campaign costs. Its provisions deal with the communications media, campaign contributions, disclosure and reporting requirements, and tax incentives to encourage the small donor to contribute to the

4

candidate or party of his choice." *Hernstadt v. FCC*, 677 F.2d 893, 897 (D.C. Cir. 1980) (quoting S. Rep. No. 96, 92d Cong., 1st Sess. 33 (1971)).

Under FECA, "[a]ny person who believes a violation of [the] Act . . . has occurred, may file a complaint" with the FEC.  2 U.S.C. § 437g(a)(1).  After the agency reviews the complaint, notifies alleged violators of the Act that a complaint has been filed against them, and provides an opportunity for response, its six commissioners vote on whether there is "reason to believe" a violation has occurred.  *Id.* § 437g(a)(2).  If at least four commissioners find "reason to believe" a violation has occurred, the FEC must begin an investigation.  *Id.*  If not, the FEC dismisses the complaint, and the complainant can seek judicial review in the United States District Court for the District of Columbia.  *Id.* § 437g(a)(8); *see also Hagelin v. FEC*, 411 F.3d 237, 239 (D.C. Cir. 2005).

This Court may set aside the FEC's dismissal of Nader's complaint only if its action was "contrary to law," *see* 2 U.S.C. § 437g(a)(8), *e.g.*, "arbitrary or capricious, or an abuse of discretion."  *Hagelin*, 411 F.3d at 242.  This highly deferential standard presumes that the agency's decision is valid, and allows reversal "only if the agency's decision is not supported by substantial evidence, or the agency has made a clear error of judgment."  *Id.* (citations and quotation marks omitted).  Courts must judge the propriety of the agency's action solely on the grounds invoked by the agency, and a decision of "less than ideal clarity" must still be upheld so long as "the agency's path may reasonably be discerned."  *Common Cause v. FEC*, 906 F.2d 705, 706 (D.C. Cir. 1990) (citations and quotation marks omitted).  Alongside its decisions to prosecute and conduct investigations, the FEC's decisions to dismiss complaints are entitled to great deference as long as it supplies reasonable grounds.  *Akins v. FEC*, 736 F. Supp. 2d 9, 21 (D.D.C. 2010).

## III.   THE PARTIES' MOTIONS [16, 18] FOR SUMMARY JUDGMENT

Mr. Nader wants the FEC's decision to close MUR 6021 and dismiss the complaint as to various groups and individuals set aside, arguing that the agency ignored evidence, employed faulty reasoning, and violated FECA's procedural rules by failing to notify each and every one of the hundreds of individuals, law firms, and political entities named in his administrative complaint of the lawsuit filed against them.   The FEC seeks deference to its decision, arguing that its determination that an investigation should not be initiated is supported by the administrative record and reasonable in the light of the insufficiency of Nader's allegations and supporting evidence as well as the significant administrative burden placed upon the agency by Nader's 575-page administrative complaint.   The Court will discuss these and other arguments in the context of the four counts Nader brought in his administrative complaint, as supplemented.

### A.   Count 1: Illegal and Unreported Contributions and Expenditures

The heart of Mr. Nader's administrative complaint is his allegation in Count 1 that numerous individuals, law firms, and political entities made "millions of dollars in illegal and unreported contributions and expenditures to benefit the Kerry–Edwards Campaign."   AR at 91. This general allegation involves a number of independent legal violations.   First, the Kerry–Edwards Campaign and the DNC are obligated under FECA to report contributions.   Second, candidates for federal office may not knowingly receive contributions in excess of certain statutory limits.   Third, the DNC and state political committees may not themselves make contributions to the Kerry–Edwards Campaign in excess of statutory limits.   Finally, any of the law firms named in Nader's complaint that are organized in the corporate form are prohibited from making contributions to the DNC or the Kerry–Edwards Campaign.   At the center of this web of related violations is the question of whether the ballot-access legal work performed by the dozens of lawyers and law firms named in Nader's complaint constitutes a "contribution"

under FECA that is subject to its restrictions.  Before addressing this and other issues, the Court will consider the governing law.

### 1.  Legal Standards

FECA contains numerous provisions relating to reporting by candidates and political organizations, as well as limits on the amount of money groups and individuals can contribute. Section 434 requires treasurers of political committees to file periodic reports of receipts and disbursements with the FEC.  2 U.S.C. § 434(a)(1).  These reports must disclose "contributions" from various sources, including "persons other than political committees."  *Id.* § 434(b)(2)(A).

A "contribution" under the Act includes "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office."  *Id.* § 431(8)(A)(i).  "Contribution" also includes "the payment by any person of compensation for the personal services of another person which are rendered to a political committee without charge for any purpose,"  *id.* § 431(8)(A)(ii), as well as "expenditures made by any person in cooperation, consultation, or concert, with, or at the request of suggestion of, a candidate, his authorized political committees, or their agents . . . ."  *Id.* § 441a(7)(B)(i). Excluded from the definition of "contribution" is "the value of services provided without compensation by any individual who volunteers on behalf of a candidate or political committee" (the "volunteer exception").  *Id.* § 431(8)(B)(i).

Contributions are subject to strict limits.  *See, e.g.*, §§ 441a(a)(1)(A), 441a(a)(2)(B), 441a(d).  Candidates may not knowingly accept a contribution in excess of these limits.  *Id.* § 441a(f).

In addition to these reporting requirements and dollar limits on contributions, FECA also prohibits corporations and unions from making any contributions in connection with an election to any political office.  *Id.* § 441b(a).  However, independent expenditures by corporations and

unions in connection with elections for political office are lawful.  *Citizens United v. FEC*, 130 S. Ct. 876, 913 (2010).

### 1. Analysis

While the FEC's General Counsel believed that Count 1 of Nader's complaint was based upon a "viable theory"—namely, that "spending by corporate law firms to remove a candidate from the ballot may constitute prohibited contributions"—she concluded that "the available facts do not support the allegations."  *Id.* at 1730.10.  This ground, adopted by the Commission in its Factual and Legal Analysis, *see id.* at 1836–41, formed the basis for the Commission's conclusion that there was "no reason to believe" that John Kerry, his campaign organizations ("Kerry for President 2004, Inc." and "Kerry–Edwards 2004, Inc.") or their treasurers, or the DNC or its treasurer violated the Act or the Commission's regulations.  *Id.* at 1730.16, 1858, 1810 (Findings Nos. 1–4).  The Court finds that the administrative record and the FEC's reasoning (in general) support its decision.

The first problem the Commission identified in Nader's complaint was that, although he named over 53 law firms and 95 lawyers that assisted individuals and Democratic state and local parties in initiating ballot-access litigation across the country, he did not specify, "with one exception, which firms allegedly provided free services or to whom, which of those firms are incorporated, and of those, which firms compensated their attorneys who worked on the ballot challenges."  *Id.* at 1730.10, 1837.  Nader says that this mis-describes his complaint.  Pl.'s Mot. Summ. J. [16-1] 13.  His complaint, he says, states that the named law firms "provided their legal services for the benefit of the Kerry–Edwards Campaign" and that nearly every lawyer working on the challenges "apparently received normal compensation from their law firms."  *Id.* (quoting AR at 92).  Nader further argues that as to the issue of whether these law firms were incorporated, this allegation could be confirmed by the FEC by a simple internet search.  *Id.*

The Court finds that the FEC's evaluation of this aspect of Nader's complaint was reasonable and supported its decision. The mere fact that these law firms, or individual lawyers employed by them, "intend[ed] to benefit the Kerry–Edwards Campaign," AR at 92, would not make their activities "contributions" to the Kerry–Edwards Campaign that would be subject to the restrictions of FECA. Even assuming that the lawyers engaged in this ballot-access work were not acting as volunteers pursuant to FECA's volunteer exception because their law firms paid them their normal compensation while they were engaged in challenging Nader–Camejo's nomination papers in various states, a law firm, whether incorporated or not, can spend as much as it wants exercising its First Amendment right to freedom of speech so long as these expenditures are not made in coordination with a candidate or political committee. *See Citizens United*, 130 S. Ct. at 913. FECA only restricts "expenditures" made "in cooperation, consultation, or concert, with, or at the request of suggestion of, a candidate, his authorized political committees, or their agents . . . ." *Id.* § 441a(7)(B)(i). However, for nearly every one of the 53 named firms, Nader doesn't tell the FEC how the law firm coordinated with the Kerry–Edwards Campaign such that its expenditures would constitute regulated contributions rather than protected independent expenditures.

As to these law firms' corporate status, which is central to Nader's allegation that they violated 2 U.S.C. § 441b's ban on corporate contributions, it is not the FEC's burden to fill in the necessary blanks in Nader's complaint. This Court's review of the 53 law firms listed in Nader's administrative complaint turned up only seven organized as "professional corporations," with the others either organized in non-corporate forms or listed with no indication of how they are organized. If it is in fact as easy as Nader says it is for the FEC to confirm that these law firms are incorporated, Pl.'s Mot. Summ. J. [16-1] 13, then it ought to have been equally easy for Nader to dig up these important facts himself. And, again, whether these law firms are

incorporated is immaterial if Nader has not provided the FEC with reason to believe that each of them made expenditures in coordination with the Kerry–Edwards Campaign.

Not all of the FEC's reasoning, however, is satisfactory. The FEC believed that Nader's allegations with respect to one law firm—Reed Smith—were sufficiently specific, but also found these allegations to be "contradictory." AR at 1730.10, 1837. The FEC notes that in one place Nader says that Reed Smith billed its costs for a Pennsylvania challenge to Nader–Camejo's nominating papers to "charity, without charging any client," while elsewhere reporting that Reed Smith received compensation from the DNC in the amount of $136,142 for "political consulting" and "legal consulting" fees in October and November 2004. *Id.* at 1730.10–.11, 1837–38. However, as noted by Nader, Pl.'s Mot. Summ. J. [16-1] 15–16, calling these allegations "contradictory" would be a terminological inexactitude. A contradiction is a direct logical inconsistency, such as a "deathless Death" or a "virtuous tyrant," reflecting the axiom that a thing cannot be and not be at the same time. But it is entirely possible that Reed Smith charged the DNC for some work while also challenging Nader–Camejo in Pennsylvania for free. This aspect of the FEC's reasoning is irrational.

But as to the crucial issue of coordination, the FEC reasonably determined that Nader's supporting facts were insufficient. Nader claims that the Ballot Project, Inc., which he describes as a Section 527 group established to prepare legal challenges to the ballot qualifications of candidates for public office, AR at 39, "directed" the ballot-access litigation in various states "in conjunction with the DNC and the Kerry–Edwards Campaign," *id.* at 50, but the FEC noted that this allegation was insufficient to suggest coordination absent "supporting facts suggesting that the Ballot Project's efforts were on behalf of the Kerry Committee or other indicia of concerted activity . . . ." *Id.* at 1852. Although Nader claims that the Ballot Project's recruitment of law

firms was "for the express purpose of benefitting the Kerry–Edwards Campaign," the most that he has alleged is parallel conduct and shared goals, not coordination.

As to Reed Smith, Nader's complaint suggests that ties between John Kerry and the firm, as well as the fact that 18 of its attorneys worked on a ballot-access challenge to Nader–Camejo in Pennsylvania, establishes coordination, *id.* at 49–50, but it was not unreasonable for the FEC to conclude otherwise.  That 18 attorneys at a law firm with somewhere north of 1,600 attorneys decided to dedicate their skills to the task of getting their preferred candidate elected, even adding the fact the John Kerry may have retained that firm's services in the past, provides no evidence of coordination between Reed Smith or its attorneys and the Kerry–Edwards Campaign with regard to the Pennsylvania ballot-access litigation.  The FEC's commissioners did not act unreasonably in wanting more from Nader on this point before launching an expensive, time-consuming, and far-reaching investigation of allegations that, by April 2010, had grown long in the tooth.

The FEC also considered evidence highlighted by Nader as conclusive on the issue of coordination, and found it to be lacking.  *Id.* at 1853–54, 1838–39.  The first is an e-mail from Caroline Adler—described by Nader as a DNC and Kerry–Edwards Campaign employee, *id.* at 7—to DNC employees working on challenges to Nader–Camejo's nominating papers.  *Id.* at 160–61.  An attachment to the e-mail, titled "Script for Nader Petition Signers," was allegedly used by DNC employees when calling people who had signed Nader–Camejo petitions.  *Id.* at 7.  However, Nader doesn't explain how this e-mail establishes coordination or even between whom.  While Nader claims that the telephone script was authored by a lawyer associated with the DNC and John Kerry, there remains a yawning gap between these allegations and the conclusion that law firms were making unreported expenditures, coordinated with the DNC or the Kerry–Edwards Campaign.

The second e-mail is from Judy Reardon—whom Nader describes as the Kerry–Edwards Campaign's deputy national director for northern New England, *id.* at 165—to Martha Van Oot, a lawyer at Orr & Reno, P.A., which is a New Hampshire law firm. *Id.* at 31. The e-mail suggests that Ms. Reardon drafted a complaint challenging Nader's New Hampshire nominating papers for various individuals who filed it in their names (some of whom are attorneys) and who were represented by Ms. Oot as well as Emily Rice, another attorney at Orr & Reno.[1] Nader believes that this e-mail demonstrates coordination between "the DNC and/or the Kerry Committee" and, one presumes, Orr & Reno. Pl.'s Opp'n Def.'s Mot. Summ. J. [19] 3. The agency, however, credited the DNC's and the Kerry Committee's responses that this e-mail did not support the conclusion that the DNC or Kerry Committee were accepting corporate in-kind contributions from Orr & Reno or any other law firms. AR at 1839, 1854. Even assuming that Ms. Reardon's action could be deemed an action of the DNC or the Kerry–Edwards Campaign, nothing in the e-mail or its attachment, or elsewhere in Nader's complaint, indicates that these attorneys or Orr & Reno were not compensated for this specific work or even how much work they performed. This is perhaps a reflection of the fact that in naming so many entities and individuals, Nader's complaint (despite its length) is generally short on factual support as to any given entity or individual. Therefore it is not surprising that the FEC, looking at this e-mail, felt disinclined to investigate Orr & Reno, let alone the dozens of other law firms and lawyers without any connection to this e-mail.

---

[1] The draft complaint indicates that it was brought on the behalf of Kathleen Sullivan, Hazel Tremblay, Dorie Gizzard, and Brian Farias. AR at 175. Ms. Sullivan is listed in Nader's complaint as a "respondent," *id.* at 30, and is described as the New Hampshire Democratic Party Chair and as a DNC official. Neither Ms. Tremblay, Ms. Gizzard, nor Mr. Farias is elsewhere mentioned in Nader's complaint. Martha Van Oot and Emily Rice are listed as the Orr & Reno attorneys who represented Sullivan, Tremblay, Gizzard, and Farias in the challenge. *Id.* at 175. Both of those attorneys are listed as respondents in Nader's complaint, as well as three other attorneys who were sent an e-mail in this chain (Mark Atkins, Burt Nadler, and Martin Honigberg). *Id.* at 31.

Nader also cites as proof of coordination the testimony, from a 2004 hearing before the Maine Bureau of Corporations, Elections and Commissions, of Maine Democratic Party Chair Dorothy Melanson. *Id.* at 4; Pl.'s Opp'n Def.'s Mot. Summ. J. [19] 3. Nader claims that this testimony shows that Ms. Melanson was directed, by the DNC, to initiate a ballot challenge to Nader–Camejo in Maine, and that the DNC paid her to do so. AR at 4. While this testimony, in this Court's opinion, provides some support for the claim that Ms. Melanson's activities were performed in coordination with the DNC, *see e.g.*, AR at 106, 108, elsewhere she gives testimony to the effect that her ballot-access activity was performed on her own initiative. *Id.* at 110. In any event, she testified that the Democratic Party promised to pay her for her work, which raises an obvious problem for Nader's claim that unreported contributions were made to the DNC by Ms. Melanson. *Id.* at 111–12. Therefore it was not unreasonable for the FEC to conclude that the evidence cited by Nader failed to support his contention that lawyers and law firms made unreported contributions, in the form of free legal services, to either the DNC or the Kerry–Edwards Campaign.

The FEC likewise determined that Nader's allegations related to a 2008 Pennsylvania Grand Jury Presentment failed to support his claim that law firms were making unreported and prohibited contributions to the Kerry–Edwards Campaign. *Id.* at 1839. That Presentment, attached to a supplement Nader provided to his administrative complaint, deals generally with alleged misconduct by dozens of Pennsylvania state employees and the use of taxpayer funds for campaign purposes. *Id.* at 758. In one section of the Presentment, *id.* at 812–15, it details the alleged misappropriation of taxpayer resources by state employees related to a challenge to the Pennsylvania nominating papers of Nader–Camejo. However, according to the FEC's reasonable reading of the Presentment, it made "no findings as to the Kerry Committee or [Reed Smith], and [did] not link any of the activities charged to any activities or knowledge of the

Kerry Committee, the DNC, lawyers, or to any actors outside of Pennsylvania." *Id.* at 1840. The FEC reasonably concluded that the factual allegations in the Presentment provided no support for Count 1 of Nader's complaint. *Id.*

In sum, the Court's evaluation of the administrative record and the FEC's reasoning leads it to conclude that the agency's determination that, as to Count 1, there was "no reason to believe" that the DNC, the Kerry Committee, their treasurers, or John Kerry personally violated FECA is not contrary to law. The fact that the FEC at one point believed internally that this matter was of a high enforcement priority does not automatically render its ultimate decision to dismiss contrary to law. *See White v. FEC*, No. Civ. A. 94-2509, 1997 WL 459849, *3 (D.D.C. July 31, 1997). Nor does it put the lie to the FEC's argument that the issue of resource allocation played an important role in its decision to dismiss. It seems eminently reasonable that a complaint involving high-profile political figures and over a hundred groups and individuals was initially thought by the FEC to merit special attention, but that upon further examination the agency concluded that there was not enough "there" there to warrant a complex investigation.

**B.  Count 2: Illegal and Unreported Contributions and Expenditures**

Count 2 of Mr. Nader's administrative complaint accuses the Service Employees International Union ("SEIU") and a Section 527 group called America Coming Together ("ACT") of making undisclosed contributions to the DNC in connection with an effort to deny Nader–Camejo ballot access in Oregon, in violation of 2 U.S.C. §§ 441b(a) and 441a(a)(2)(B). *Id.* at 93–94. Nader claimed that SEIU violated Section 441b's ban on union contributions to national political parties, that such contributions exceeded the $15,000 limit in Section 441a(a)(2)(B), and that the union further violated FECA by paying a law firm to investigate Nader–Camejo petitioners and by paying its own staff to participate in the ballot-access challenges. AR at 94. The Commission found "no reason to believe" that ACT violated FECA.

*Id.* at 1810.  As to SEIU, the FEC failed to notify the union of Nader's complaint, and Nader's allegations with respect to it were essentially dismissed when the agency closed the MUR with respect to "all Respondents and other persons and entities named in the complaint . . . ."  *Id.* at 1811.

In evaluating Nader's allegations and factual support, the FEC identified many of the same problems with these allegations vis à vis SEIU and ACT as it found with respect to Nader's allegations in Count 1 against the DNC, Kerry Committee, John Kerry, and various law firms and lawyers.  The FEC stated in its General Counsel report and in its factual and legal analyses that Nader's complaint "does not allege, and the available information does not suggest, that SEIU's and ACT's activities in Oregon were coordinated with the Kerry Committee, the DNC, or any other entity."  *Id.* at 1730.19, 1843.

In reaching this conclusion, the agency examined Nader's claim that SEIU and the DNC maintained "close political and financial ties" in part because Anna Burger—SEIU's Secretary–Treasurer—is a "DNC official."  *Id.* at 76.  Nader believes that the fact that Ms. Burger is a "DNC official" "plainly establishes" reason to believe that ACT and SEIU coordinated with the DNC or the Kerry–Edwards Committee on the Oregon ballot challenges, Pl.'s Mot. Summ. J. [16-1] 17.  However, the FEC reasonably concluded otherwise, and its determination is entitled to deference by this Court.  The FEC determined that the fact that Ms. Burger is a "member-at-large" of the DNC (which is the lowest level on the DNC totem pole, AR at 388–99) provided no basis for inferring that she was involved in the DNC's decision making such that coordination between the DNC and SEIU arose from her activities.  AR at 1730.19 (applying 11 C.F.R. § 109.21(d)(2)).  Given the dearth of information in Nader's complaint regarding coordination between the Kerry–Edwards Campaign or the DNC and SEIU or ACT, this Court finds that the

FEC's determination as to the insufficiency of Nader's complaint is supported by the record and not clearly erroneous.

The FEC also reasonably discounted the evidence Mr. Nader offered to support his claim that the SEIU made large, unreported contributions to the DNC, thereby violating FECA's prohibition against labor-union contributions to national political committees.  *Id.* at 76 (citing 2 U.S.C. § 441b(a)).  Nader's support for this allegation comes from the SEIU's website, where, in a press release, the union stated that it "gave $1 million to the DNC . . . ."  *Id.* at 523.  However, the FEC concluded that this statement was ambiguous and didn't necessarily mean that SEIU literally cut a check to the DNC in the amount of $1 million.  *Id.* at 1730.19.   The FEC also believed that this statement, as interpreted by Nader, was essentially refuted by the SEIU in a prior MUR (also involving a claim that SEIU violated 2 U.S.C. § 441b) and was not the sort of statement the union would be expected to make publicly if true.  *Id.* at 1730.19.  Given this apparent refutation and the absence of supporting evidence in the SEIU's disclosures to the FEC, *id.* at 1730.20, the FEC concluded that Nader's allegations were insufficient to warrant an investigation of either SEIU or ACT.  *Id.*  This Court, after reviewing Nader's complaint and the FEC's analysis, concludes that the FEC's decision not to pursue these allegations further has support in the record and is not contrary to law.

In sum, the Court finds that the FEC's decision to find "no reason to believe" that ACT violated FECA and to close the MUR with respect to SEIU and other individuals and groups connected with Nader's allegations in Count 2, *id.* at 1810–11, is not contrary to law.

### C.  Count 3: Failure to Register

Count 3 of Nader's administrative complaint alleges that the "Section 527 Respondents"—namely, the National Progress Fund, United Progressives for Victory, Uniting People for Victory,  the Ballot Project, and Americans for Jobs—failed to register with the FEC

as political committees, in violation of FECA.  *Id.* at 9, 18, 19 (citing 2 U.S.C. § 441 *et seq.*).

Nader also claims that these groups knowingly accepted contributions and made expenditures in

violation of the contribution limits in Sections 441a(a)(1) and 441a(a)(2).  *Id.*  at 95.  Of these

five entities, only ACT and the Ballot Project responded to Nader's complaint.  *See id.* at 1455,

1612.

Upon review of the administrative record and the parties' arguments, the Court concludes

that the FEC's decision not to investigate the allegations related to Count 3 of Nader's complaint

is not contrary to law.  As an initial matter, the FEC's General Counsel noted that ACT, contrary

to Nader's allegations, was registered as a political committee and had been since 2003.  *Id.* at

1730.27.  The Commission therefore found that there was "no relieve to believe" that as to ACT,

a violation of 2 U.S.C. § 433 had occurred.  *Id.* at 1810.  While the agency noted that ACT, in its

response, had neither confirmed nor denied that it had made expenditures related to ballot-access

litigation against Nader–Camejo, the FEC determined that an investigation of this allegation

would be hampered by the fact that ACT was "essentially [] defunct," *id.* at 1730.27, and

because any such investigation, concerning alleged activity more than five years old, would

"encounter difficulties with obtaining relevant documents" and "stale witness memories."  *Id.* at

1730.28.  Those same issues apply to the Ballot Project, which was dissolved in September 2005.

*Id.*  While Nader argues that the FEC is exaggerating the difficulty of investigating these defunct

organizations, the Court believes that the FEC is in a better position to evaluate its own resources

and the probability of investigatory difficulties than is Mr. Nader.

As to the other Section 527 groups—United Progressives for Victory, Uniting People for

Victory, Americans for Jobs, and the National Progress Fund—the FEC recognized that these

groups, based on the allegations in Nader's complaint, may have engaged in political activity that

would have obligated them to register as political committees, but it concluded that each of them

was either defunct or had ceased operations, and that in those circumstances its prosecutorial discretion should be exercised to dismiss the allegations as to those groups. *Id.* at 1730.30.

The Court finds that the FEC's decision to dismiss the complaint as to the Section 527 groups named in Count 3 was not contrary to law, and represents a reasonable exercise of the agency's considerable prosecutorial discretion. The FEC has "broad discretionary power in determining whether to investigate a claim," and its decisions to dismiss complaints are entitled to great deference as well, as long as it supplies reasonable grounds. *Akins*, 736 F. Supp. 2d at 21. Nader has not provided any evidence or presented any arguments that suggest abuse of this discretion; he appears only to argue that it should have been exercised differently. Pl.'s Mot. Summ. J. [16-1] 19–20. However, as the Supreme Court has noted, a decision to *not* investigate a claim involves a complicated balancing of various factors that are "peculiarly within [the agency's] expertise," including whether a violation has occurred, whether the agency's resources are better used elsewhere, whether its action would result in success, and whether there are sufficient resources available to take any action at all. *Heckler v. Chaney*, 470 U.S. 821, 831 (1985).

While, unlike in the *Heckler* case, judicial review is available under FECA to complainants dissatisfied with the FEC's decisions not to investigate, *see* 2 U.S.C. § 437g(8)(A), the agency has provided reasonable grounds for not proceeding further. The FEC is in a better position than is Mr. Nader to evaluate the strength of his complaint, its own enforcement priorities, the difficulties it expects to encounter in investigating Nader's allegations, and its own resources. Furthermore, the difficulties identified by the FEC in terms of staleness of evidence and the defunctness of several of the groups against whom Nader has made allegations are in large part the responsibility of Nader, who filed his complaint 3.5 years into the 5-year statute of limitations. Nader appears to argue that the FEC is precluded from making this argument so

long as he files his complaint within the 5-year statute of limitations, Pl.'s Mot. Summ. J. [16-1] 19, but the statute of limitations only provides a hard limit on when such actions can be brought. The passage of time, even within the period, will obviously impair investigations, and the FEC's conclusion that Nader's delay would impact the difficulty of any investigation is not contrary to law.

### D.  Count 4: Allegations Involving the 2006 Romanelli Campaign

What the FEC calls "Count 4" of Nader's complaint relates to a series of allegations set out in an October 2008 supplement to Nader's administrative complaint.  AR at 741.  That supplement notified the FEC of new information arising out of a Grand Jury Presentment released by a Pennsylvania Attorney General in July 2008.  *Id.*  In general, the Presentment concerned charges of conspiracy, theft, and conflict of interest against members and employees of the Pennsylvania House Democratic Caucus.  *Id.*  Nader claimed that the use of taxpayer money for campaign purposes alleged in the Presentment was also involved in the Nader–Camejo ballot challenge in that state.  *Id.*  He asked the FEC to name additional respondents (*i.e.*, various Pennsylvania state legislators), to investigate the information in the Presentment to determine "whether Respondents committed civil violations of FECA," and to refer MUR 6021 as a whole to the Justice Department for a criminal investigation.  *Id.* at 742.  He also asked the FEC to add additional respondents and to investigate civil violations of FECA related to an alleged scheme relating to a ballot challenge against Carl Romanelli, who was a Green Party candidate for United States Senate in 2006.  *Id.*  This latter allegation is perhaps most properly labeled as an additional count, since the information in the Presentment related to Reed Smith and the state legislators appears to relate only to the allegations in Count 1.

As to Nader's claim related to a ballot-access challenge against Carl Romanelli, Nader appears to have abandoned that claim and does not address it anywhere in his summary-

judgment submissions.   Nevertheless, the FEC's decision to close MUR 6021 as to any respondents and entities associated with Count 4 is not contrary to law.  *Id.* at 1811.  The FEC reasonably concluded that Nader's claim was too speculative to warrant an investigation.  *Id.* at 1730.31.  For example, Nader alleged in his original complaint in this Court that the Senate campaign of Bob Casey was involved in the challenge to Mr. Romanelli's nominating papers, using the labor of state employees and "misappropriated taxpayer funds,"  Compl. [1] 19, but the FEC reasonably concluded that Nader's allegations represented an expansive gloss on the Presentment, which did not charge Mr. Casey, his campaign, or lawyers working on his behalf with any wrongdoing.  AR at 1730.31.

The FEC's decision not to proceed with an investigation of the allegations in Count 4 was further supported by its determination that a state investigation of criminal activity by state employees was ongoing, and that an investigation by the FEC would require an extensive amount of the agency's limited resources.  *Id.*  Particularly given that Mr. Nader fails to present any arguments to the contrary in his summary-judgment submissions, the agency's conclusions on this score are reasonable and not contrary to law.

While the agency's decision to essentially dismiss Count 4 would be entitled to deference in any case, the Court also notes that Mr. Nader lacks Article III standing to bring a claim involving a ballot challenge in an election for the U.S. Senate in which he was not a candidate. To establish standing, a plaintiff must identify an injury in fact that is actual or imminent and traceable to the challenged action of the defendant, and show as well that it is likely, and not merely speculative, that a favorable decision would redress the plaintiff's injury.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Mr. Nader has not asserted any injury to him as a result of the ballot-access litigation initiated against Mr. Romanelli.

In sum, the FEC's decision to close MUR 6021 as to all respondents and entities associated with Count 4 of Nader's complaint, as supplemented, is not contrary to law.

### E.  The FEC's Failure to Notify Various Individuals and Entities

Perhaps the most persuasive aspect of Mr. Nader's motion is his argument that the FEC mishandled his administrative complaint.  He claims that the agency's decision to dismiss the complaint should be set aside because it violated FECA by failing to notify dozens of "respondents" concerning the administrative complaint filed against them.  Pl.'s Mot. Summ. J. [16-1] 6–11.

The Court finds that Nader is correct that the FEC's failure to notify all persons and entities who were alleged to have violated the Act was improper.  FECA says very clearly that "[w]ithin 5 days after receipt of a complaint, the Commission *shall* notify, in writing, *any person* alleged in the complaint to have committed [a violation of FECA]."  2 U.S.C. § 437g(a)(1) (emphasis added).  The FEC has not identified any statutory or other authority for the proposition that, despite the Act's clear language, it has discretion to notify whomever it wants as "respondents" to the administrative complaint.  The statute clearly strips the agency of that discretion.  While the FEC may be correct that, as interpreted by Mr. Nader and this Court, FECA provides complainants with a means to harass their opponents with frivolous complaints and tax the agency's limited resources, Def.'s Mot. Summ. J. [18] 20, it is not within the FEC's or this Court's power to "interpret" away a clear law to solve these problems.  Correcting ill-advised legislation is a responsibility entrusted to Congress alone.  By failing to notify the dozens of individuals and groups named in Nader's complaint, the FEC clearly violated the procedural requirements of FECA.

However, despite this clear defect in the FEC's handling of Nader's administrative complaint, this was harmless error.  The FEC's failure to follow the notice procedures in Section

437g of FECA should be disregarded by courts if such errors are harmless. *FEC v. Club For Growth, Inc.*, 432 F. Supp. 2d 87, 90 (D.D.C.) (quoting *Doolin Sec. Sav. Bank v. Office of Thrift Supervision*, 139 F.3d 203, 212 (D.C. Cir. 1998)).  While Nader says that the FEC's failure to follow FECA's procedural requirements was "no harmless error," Pl.'s Mot. Summ. J. [16-1] 12, he doesn't specifically identify the harm to him that flowed from the FEC's error.

At various points in his submissions, Nader suggests that certain information that would have been useful to the FEC could have been obtained if it had served each and every one of the persons and entities named in his administrative complaint, but at no time is it clear that by doing so a benefit to Nader would have resulted.   The Court finds no reason to believe that had the FEC properly notified all alleged "respondents," it would have reached a different decision in this case. *See City of Portland v. EPA*, 507 F.3d 706, 716 (D.C. Cir. 2007).  For example, Nader claims that the FEC could have obtained information about law firms' billing records by serving them with his administrative complaint, Pl.'s Mot. Summ. J. [16-1] 14, but this doesn't accurately describe what would necessarily have followed the FEC's notification of these firms. First, none of those law firms was required to respond or provide any information absent a subpoena.  Second, even if they did choose to respond with evidence of their billing practices, there is no reason to think that these responses would contain information favorable to Nader. Nader assumes the same elsewhere, when he states that the FEC, if it had served SEIU with Nader's complaint, would have confirmed that the union made illegal unreported contributions to the DNC.  *Id.* at 18.  However, nothing indicates that such confirmation would have resulted from proper notification of SEIU.  The FEC did evaluate Nader's allegations as to SEIU, and it determined that Nader hadn't given the agency enough information for it to conclude that an investigation of the union, let alone service of the complaint, would produce evidence of FECA violations.

The notice procedures set out in Section 437g are for the benefit of those whom Nader alleges violated the Act, not for Nader's benefit.  Since MUR 6021 was closed as to all persons and entities named in Nader's complaint, the only persons and entities who could have been prejudiced by the FEC's error were ultimately absolved of liability.

Therefore the Court finds that the FEC's failure to follow the notice requirements of Section 437g is harmless.

## IV.    CONCLUSION

Although the FEC's decision making in this case was, at times, of less than ideal clarity, and although its practices with respect to notification of respondents merit the agency's attention given the drift this Court has observed between those practices and the procedural requirements of FECA, the agency's decision in this case is not contrary to law.  Therefore, for the reasons stated above, the Court will grant defendant's Motion [18] for Summary Judgment and deny plaintiff's Motion [16] for Summary Judgment.

A separate Order consistent with this Memorandum Opinion shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on November 9, 2011.